UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

STEADFAST INSURANCE COMPANY, a
Delaware corporation; and
AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY, a
New York corporation,

        Plaintiffs,

    v.                    NO. CIV. S-05-0632 FCD JFM

                            MEMORANDUM AND ORDER

JAMES DOBBAS, an individual;
PAMELA DOBBAS, an individual;
DONALD DOBBAS, an individual;
PETER MANCINI and LISA
MANCINI, husband and wife;
PETER MANCINI, as Special
Administrator of the ESTATE OF
CLAUDETTE MANCINI, deceased;
LISA MANCINI , as the Guardian
Ad Litem for NASYA MANCINI, a
minor; FALLON TURNER, an
individual; MERRICK TURNER, an
individual,

        Defendants.
_____/

AND RELATED COUNTER-CLAIMS
_____/

----oo0oo----

1

This matter is before the court on cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure,[1] filed by plaintiffs and counterdefendants Steadfast Insurance Company ("Steadfast") and American Guarantee and Liability Insurance ("American") and by defendants and counterclaimants, Peter Mancini, Lisa Mancini, Nasya Mancini, Fallon Turner, and Merrick Turner (collectively, "defendants").[2] For the reasons set forth below,[3] plaintiffs' motion is GRANTED in part and DENIED in part and defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND[4]

This claim arises out of a dispute regarding insurance coverage. The facts giving rise to the claims made by the defendants involve a bodily injury/wrongful death lawsuit following a collision of the Turner vehicle with an Angus bull

---

[1]   All further references to the "Rules" are to the Federal Rules of Civil Procedure, unless otherwise noted.

[2]   Plaintiffs/Counterdefendants will be designated collectively as "plaintiffs." Defendants/Countercomplainants will be designated collectively as "defendants." Defendants James Dobbas, Pamela Dobbas, and Donald Dobbas are not counterclaimants, and have not filed a response to plaintiffs' motion for summary judgment.

[3]   Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs. E.D. Cal. Local Rule 78-230(h).

[4]   Unless otherwise noted, the facts recited herein are undisputed. (See Defs.' Joint Response to Pls.' Stmt. of Undisputed Facts, filed Nov. 27, 2007 ("DUF"); Pls.' Response to Defs.' Stmt. of Undisputed Facts, filed Jan. 3, 2008 ("PUF"); Defs.' Response to Pls.' Separate Stmt. of Undisputed Facts ("RUF")). Where the facts are disputed, the court recounts both parties versions of the facts. (See Defs.' Joint Separate Stmt. of Disputed Facts, filed Nov. 27, 2007 ("DSDF"); Defs.' Reply Stmt. of Undisputed Facts ("RSDF")).

and a subsequent collision of the Turner vehicle with the Mancini vehicle. (DUF ¶¶ 2-3). The collisions occurred on May 27, 2002. (DUF ¶ 1). The Angus bull belonged to James Dobbas ("Dobbas") and had escaped from the pasture owned by Milton Holstrom ("Holstrom"). (DUF ¶ 1) The collisions involved two fatalities, and four of the vehicles' occupants were injured. (DUF ¶ 4). The Turner defendants and Mancini defendants filed complaints against Dobbas, Holstrom, and others in separate actions. (DUF ¶¶ 5-7). However, they later consolidated their cases in the United States District Court for the District of Nevada (the "Nevada District Court"). (DUF ¶ 8).

Fred Vitas ("Vitas") and Vitas Insurance Agency, LLC ("VIA") had agreed to procure and maintain primary and umbrella farming liability insurance policies for Dobbas. (DUF ¶ 9). These policies were to provide coverage for Dobbas' livestock-husbandry activities. (DUF ¶ 9). The farm liability policy insuring Dobbas was originally issued by CalFarm Insurance Company ("CalFarm"). (DUF ¶ 9). In 2001, CalFarm was purchased by Allied Insurance Company ("Allied"). (DUF ¶ 9). Allied issued the renewal of the liability policy under its own name. (DUF ¶ 9).[5] Vitas and VIA placed a farm liability policy for Dobbas, effective March 31, 2002 through March 31, 2003, which provided

_____

[5]    Defendants deny these facts (DUF ¶ 9) on the basis that it is not supported by the evidence cited by plaintiffs. The court recounts these facts for background purposes only, as they are not relevant to the analysis of the pending motions. Plaintiffs refer to the representative insurance company as CalFarm while defendants refer to the representative insurance company as Allied. Because there appears to be no dispute regarding the actual representation, the court will refer to the representative insurance company as "CalFarm/Allied."

primary coverage of $1 million for each occurrence of liability

arising out of Dobbas's farming and livestock-husbandry

activities.  (DUF ¶ 10).  Vitas and VIA also placed a CalFarm

umbrella insurance policy for Dobbas, which provided $3 million

liability limits per occurrence.  (DUF ¶ 12).  These policies

were effective from March 1999 to March 2001.  (DUF ¶ 12).

Dobbas and his counsel were advised after the collision that the

umbrella policy was cancelled or not renewed.  (DUF ¶ 14).

Dobbas and Holstrom tendered defense of the claim to

CalFarm/Allied.  (DUF ¶ 13).

On May 23, 2003, the parties to the claim participated in a

mediation, and CalFarm/Allied offered the $1 million limit of the

policy as part of the settlement.  (DUF ¶ 16).  The Turner and

Mancini defendants eventually accepted the $1 million offer as

part of the settlement, which also included a binding arbitration

to determine the issue of Dobbas' liability and to apportion the

recovery between the Turners and the Mancinis.  (DUF ¶ 17).  The

parties agreed prior to arbitration that the arbitration would be

binding, with no right of appeal, and that the Mancinis and

Turners would execute a Covenant Never to Execute against Dobbas'

personal assets.  (DUF ¶¶ 18-19).[6]  The parties further agreed

that Dobbas would turn over his rights, title, and interest in a

cause of action against Vitas and VIA to the Turners and the

Mancinis.  (Defs.' Stmt. of Disp. Facts in Opp'n to Pls.' Mot,

filed Nov. 27, 2007, ("DSDF") ¶ 16).  The binding arbitration was

---

[6]     This covenant was executed on the same day of the
arbitration and provided that, in consideration of payment of $1
million under the Farm Liability Policy, defendants would never
execute against Dobbas or CalFarm/Allied.  (Id. ¶¶ 20-22).

4

also to serve the purpose of giving legal effect to the claims so that the Mancinis and Turners could pursue the action against Vitas and VIA.  (DUF ¶ 17).  Defendants contend that Dobbas was resolute in his refusal to stipulate to liability.  (DSDF ¶ 17).  Defendants also assert that there were no secret or other agreements, express or implied, that the arbitration would be anything other than a straightforward contest of the issues on liability and damages.  (DSDF ¶ 21).

The arbitration was held on February 25, 2004 and was concluded in less than one day.  (DUF ¶¶ 20, 23).  Defendants assert that the arbitration focused on two principal issues: liability and the general damages claims.  (DSDF ¶ 39).  Defendants also assert that Justice Sparks, the arbitrator, was not made aware of CalFarm/Allied's irrevocable offer of its policy limit.  (DSDF ¶ 38).  The Mancinis and Turners presented six live witnesses, one witness by deposition testimony, and 27 exhibits.  (DUF ¶ 25).  They also presented expert testimony.  (DUF ¶ 26).  Dobbas presented two witnesses.  Plaintiffs contend that Dobbas did not present any expert testimony to rebut defendants' expert.  (DUF ¶ 27).  Defendants assert that Dobbas was qualified to testify as an expert and that Dobbas testified regarding the standard of care for pasturing bulls.  (DSDF ¶ 53).  The parties agreed that medical records could be introduced in lieu of testimony from defendants' treating physicians because the nature and extent of the injuries were beyond reasonable dispute.  (DSDF ¶ 40).  The parties also stipulated that the medical bills could be introduced into evidence without the foundational testimony of the physicians.  (DSDF ¶ 41).

In March 2004, the arbitrator issued a $5 million award against Dobbas – $3 million in favor of the Turners and $2 million in favor of the Mancinis.  (DUF ¶ 48).  On April 24, 2004, the Nevada District Court confirmed the arbitrator's award and entered judgment against Dobbas.  (DUF ¶ 49).  By agreement of the parties, this judgment was not appealable.  (DUF ¶ 50).

On May 7, 2004, counsel for Dobbas wrote to counsel for the Turners and counsel for the Mancinis, informing them that two additional insurance policies, of which all parties were previously unaware, had been located.  (DUF ¶ 51).  The two policies were issued by plaintiffs Steadfast and American.  (DUF ¶ 51).  In May 2004, plaintiffs first received notice of the 2002 collision through service of a cross-claim filed by Cal-Farm/Allied in a related action brought by James and Pamela Dobbas against Vitas and VIA in May 2003.  (DUF ¶¶ 58-61).  Steadfast acknowledged receipt of the claims and reserved all rights by a letter dated May 14, 2004.  (DUF ¶ 62).

Steadfast issued a commercial general liability policy to James Dobbas, Inc. ("JDI") with a policy period of August 1, 2001 to August 1, 2002, and American issued a commercial umbrella policy to JDI for the same policy period.  (RUF ¶ 1).  The Steadfast policy provides coverage up to $1 million for each occurrence and $2 million in the aggregate.  (PUF ¶ 2).  The American policy has coverage limits of $7 million for each occurrence and in the aggregate.  (PUF ¶ 12).  The Steadfast policy is the policy of insurance listed in the schedule of underlying insurance attached to and forming a part of the American policy.  (PUF ¶ 19).  Dobbas is a named insured under

6

both policies.  (RUF ¶ 3).  However, the policies expressly provide that an individual is an insured "only with respect to the conduct of a business of which [the individual] is a sole owner."  (RUF ¶ 4).

The Declarations page of the Steadfast policy specifies the "Business Description" for the insured as "Railroad Contractor." (RUF ¶ 2).  JDI is a railroad contractor with operations that include railroad salvage and providing emergency response to train derailments.  (RUF ¶ 6).  The Controller for JDI, James Emmitt ("Emmitt") has been in charge of risk management and procuring insurance for JDI since 1997.  (RUF ¶ 7).  Emmitt asserts that plaintiff sought liability coverage from Steadfast and American for JDI's railroad and related functions.  (RUF ¶ 7).  Emmitt never understood or expected the policies to provide coverage for Dobbas' ranching activities.  (RUF ¶ 8).  He asserts that Dobbas was listed individually as an insured only because JDI stored some equipment on Dobbas' property and Dobbas would sometimes move JDI's equipment.  (RUF ¶ 22).  Emmitt advised JDI's insurance broker, Charles O'Dell ("O'Dell"), to procure appropriate insure to meet JDI's railroad liability coverage needs.  (RUF ¶ 10).  Although O'Dell was aware that Dobbas owned cattle, he never contemplated obtaining coverage for Dobbas' ranching activities; O'Dell was aware that Dobbas used another broker for his personal use.  (RUF ¶¶ 13-14).  The original underwriter for the Steadfast policy, Robert Fellerath ("Fellerath"), asserts that he was not aware of Dobbas' ranching activities at all times prior to the accident and that if he was

aware of such activities, he would have declined any exposure. (RUF ¶¶ 17-18).[7]

Moreover, Dobbas did not understand that the policies issued by plaintiffs provided coverage for his ranching activities, which is why he never tendered the underlying claim to Steadfast and American.  (RUF ¶ 9).  At the time of the underlying accident, Dobbas believed he had $4 million in liability coverage for his ranching activities under polices procured for him by Vitas.  (RUF ¶ 24).  Dobbas was not aware that he continued to be a named insured under the policies issued to JDI at the time of the underlying accident.  (RUF ¶ 26).

On March 30, 2005, plaintiffs filed a complaint in this court, seeking declaratory and equitable relief against all defendants.  In May 2005, defendants filed counterclaims against plaintiffs for declaratory relief and damages.  On October 31, 2005, plaintiffs filed a motion for summary judgment on the issue of notice.  Plaintiffs argued that they were prejudiced by Dobbas' failure to give notice of the claim, and therefore, their policy obligations to defendants are now completely excused.  The court denied plaintiffs' motion, holding that plaintiffs had failed to meet their burden of demonstrating actual prejudice as a matter of law.  (Mem. & Order [Docket #63], filed Jan. 12, 2006).  Subsequently, the parties engaged in vigorous discovery disputes in a related action in the Nevada District Court.  As a result, this action was stayed until September 2007.

---

[7]    Defendants deny that Fellerath was ignorant of Dobbas' ranching activities at the time he underwrote the Steadfast policy, but fail to cite to any evidence to support their denial.

Both plaintiffs and defendants now move for summary judgment.  Plaintiffs move for summary judgment on their First,[8] Fourth, Fifth, and Sixth claims for relief and on defendants' counterclaims.  Defendants move for summary judgment on all claims brought by plaintiffs and on their counterclaim for payment of the judgment.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  See Celotex, 477 U.S. at 323-24.  If the moving party does not bear the burden of proof at trial, he or she may

---

[8]    While plaintiffs did not formally notice a motion for summary judgment on their First claim for relief, they request such adjudication in their opposition to defendants' motion. (Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") [Docket #147], filed Jan. 3, 2008, at 2).

discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." <u>Celotex</u>, 477 U.S. at 325.  Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.  In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence.  <u>See</u> <u>T.W. Elec. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  The evidence presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  <u>See</u> <u>Falls Riverway Realty, Inc. v. City of Niagara Falls</u>, 754 F.2d 49, 57 (2d Cir. 1985); <u>Thornhill Publ'g Co., Inc. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).

### ANALYSIS

The crux of this litigation is whether plaintiffs' insurance policies provided coverage to Dobbas.  Plaintiffs contend that the insurance policies as written do not cover such activities and alternatively, that Dobbas' actions after the collision,

10

namely submitting to binding arbitration with out giving them
prior notice of the claims, preclude coverage.

Under California law, the interpretation of an insurance
policy is a question of law.  Waller v. Truck Ins. Exch., Inc.,
11 Cal. 4th 1, 18 (1995) (citing AIU Ins. Co. v. Superior Court,
51 Cal. 3d 807, 818 (1990)).  It is the insured's burden to prove
that a claim comes within the basic coverage of the policy.
Royal Globe Ins. Co. v. Whitaker, 181 Cal. App. 3d 532, 537
(1986).  However, the insurer bears the burden of demonstrating
that a claim falls within a purported exclusion from coverage.
Gray v. Zurich Ins. Co., 65 Cal. 2d 263 (1966).

Courts must interpret a contract "to give effect to the
mutual intention of the parties as it existed at the time of
contracting."  Cal. Civ. Code § 1636 (West 2008).  Where the
contract is in writing, "the intention of the parties is to be
ascertained from the writing alone."  Cal Civ. Code § 1639 (West
2008); Haynes v. Farmers Ins. Exch., 323 Cal. 4th 1198, 1204
(2004).

The court must first look at the language of the policy "to
ascertain its plain meaning or the meaning a layperson would
ordinarily attach to it."  Waller, 11 Cal. 4th at 18.  "If the
meaning a layperson would ascribe to contract language is not
ambiguous," the court must apply that meaning.  AIU Ins. Co, 51
Cal. 3d at 822.  The policy language must be viewed and
interpreted in the context of the contract as a whole.  Powerine
Oil Co., Inc. v. Superior Court, 37 Cal. 4th 377, 391 (2005).  If
there is ambiguity, it is generally resolved against the insurer
and in favor of coverage.  Id. ("Because the insurer writes the

11

policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage."). However, an insurance company may select the risks it will and will not insure, and the court must respect coverage limitations set forth in an insurance policy. <u>Legarra v. Federated Mutual Ins. Co.</u>, 35 Cal. App. 4th 1472, 1480 (1995).

A policy provision is ambiguous if it is capable of two or more reasonable constructions. <u>Waller</u>, 11 Cal. 4th at 18. Extrinsic evidence can be considered by the court if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." <u>Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.</u>, 69 Cal. 2d 33, 37 (1968); <u>Wolf v. Superior Court</u>, 114 Cal. App. 4th 1343, 1356 (2004); <u>see also Travelers Indem. Co. v. Arena Group 2000, L.P.</u>, No. 05-cv-1435, 2007 WL 4170421, at *6 (Nov. 20, 2007). Such extrinsic evidence may include "the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature, and subject matter of the contract; and the subsequent conduct of the parties." <u>Wolf</u>, 114 Cal. App. 4th at 1356; <u>see Travelers</u>, 2007 WL 4170421, at *6.

Furthermore, where a part of a contract is written or printed under the special direction of the parties and the remainder is copied from a form prepared without reference to the particular contract in question, "the parts which are original control those which are not." <u>Fid. & Deposit Co. of Maryland v. Charter Oak Fire Ins. Co.</u>, 66 Cal. App. 4th 1080, 1087 (1998) (citing Cal. Civ. Code § 1651). When information in the declarations or endorsements conflict with general information in

the preprinted forms, "the former prevails over the latter."  See
id.

**A.    Extent of Coverage**

Plaintiffs' First claim for relief seeks declaratory relief
that the Steadfast and American insurance policies were issued to
cover salvaging operations and did not provide coverage for the
business of husbanding livestock.  Plaintiffs argue that the
Declarations page of the Steadfast policy expressly states that
the scope of coverage is limited to the insured's business as a
"Railroad Contractor," and thus, it is evident that the policies
did not provide coverage for Dobbas' unrelated livestock
activity.  Defendants contend that the modification to the
insurance policy in "Endorsement No. 1," which lists five
additional persons or entities as named insureds including Dobbas
as an individual, clearly evidences the parties' intent to insure
Dobbas for losses arising from any of his businesses.

**1.    The Steadfast Policy**

The Steadfast policy provides for general commercial
liability for JDI.  Steadfast contends that because the
Declarations page of its policy describes the business of the
insured as "Railroad Contractor," Dobbas' liability arising out
of any other business is not covered by the policy.

The information contained in the Declarations page of a
policy will control the coverage provided.  Charter Oak, 66 Cal.
App. 4th at 1086.[9]  "If the declarations indicate that the policy

_____

[9]    Defendants assert that Charter Oak is inapplicable to
the facts of this case because the court was not confronted with
(continued...)

13

does not provide coverage for the defendant in the underlying
litigation, no further review of the policy is necessary." Id.
In Charter Oak, the California Court of Appeal determined the
scope coverage of an insurance policy issued to Western Savings &
Loan Association ("WSLA") by Charter Oak Fire Insurance Company
("Charter Oak"). Id. at 1082.  WSLA sought coverage from Charter
Oak for construction defects in a townhome development in
California owned by WSLA. Id. at 1082-83.  The Charter Oak
policy was issued to WSLA "DBA Marina Inn," a motel property
located in Arkansas, and the general declarations pages of the
policy specified that the business of the named insured was
"Motel and & Restaurant." Id. at 1082.  The Charter Oak court
found that even if the Marina Inn was not a separate entity from
WLSA, the Charter Oak policies, when read as a whole and in view
of the declarations page, "clearly limit[ed] coverage to a motel
and restaurant" in Arkansas. Id. at 1087.  As such, the court
denied WLSA's claim for coverage with respect to the California
townhomes. Id.

    In 2007, the United States District Court for the Southern
District of California similarly held the business description on
a declarations page was an important factor in limiting insurance
coverage. Travelers, 2007 WL 4170421, at *6.  In Travelers, the
insurer asserted that the primary policy did not cover claims

---

[9](...continued)
an insurance policy that identified other named insureds by
status.  The court disagrees.  In Charter Oak, the court
recognized the importance of the description of the business on
the declarations page as a limitation to coverage, even where the
insured listed on the declarations page was the same entity with
the same organization structure that was seeking coverage.
Defendants' distinction is irrelevant.

1  arising out of an injury to a pedestrian at the insured's
2  shopping center located next to the insured's sports arena.  Id.
3  at *1-2.  The policy listed the business description on the
4  declarations page as "Sports Arena."  Id. at *2.  Viewing the
5  policy as a whole and in light of the declarations page, the
6  court held that the insured under the primary policy was the
7  sports arena, not the shopping center.  Id. at *6.  The Travelers
8  court also found the insured's purchase of a separate primary
9  policy for the shopping center relevant to the determination that
10  the intent of the parties was to only cover the sports arena.
11  Id.

12      Under the facts of this case, the Steadfast policy
13  unambiguously provides coverage for JDI and the individual named
14  insureds *only* for injuries relating to the business of "Railroad
15  Contractor."  The Declarations page tailored for this particular
16  policy limited the coverage of the policy based upon the business
17  description.  See Charter Oak, 66 Cal. App. 4th at 1087.  To hold
18  otherwise, would render the parties' modification of the policy
19  meaningless.  Moreover, the extrinsic evidence supports the
20  finding that the parties did not intend for coverage to extend to
21  Dobbas' ranching activities.  Dobbas purchased both primary and
22  umbrella coverage for his ranching activities through Vitas and
23  VIA.  If Dobbas believed that the Steadfast policy also covered
24  his ranching activities, he would not have sought that separate
25  coverage.  See Travelers, 2007 WL 4170421, at *6.

26      Defendants argue that the modification to the named insureds
27  contained in Endorsement No. 1, which lists Dobbas as an
28  individual named insured, demonstrates that the parties intended

15

to modify the contract to include coverage for any of Dobbas'
businesses.  Defendants contend that the "individual" status can
only have meaning when read with the pre-printed portion of the
policy defining an individual as an insured "only with respect to
the conduct of a business of which [he is] a sole owner."
(Steadfast Policy, Ex. A to 1st Am. Compl. ("FAC"), filed Apr.
15, 2005).  The court disagrees.  Dobbas' status as an
"individual" named insured does not lose all meaning if the court
does not find that he is covered with respect to any business he
owns.  Rather, the plain meaning of the insurance policy, when
viewed as a whole and considering the business description on the
Declarations page, is that Dobbas is insured as an individual
with respect to liability arising out of the conduct of the
railroad business.[10]

Defendants' reliance on the First Circuit's decision in <u>San
Juan Dupont Plaza Hotel Fire Litigation v. Pac. Employers Ins.
Co.</u>, 45 F.3d 569 (1st Cir. 1995), is also misplaced.  Defendants
argue that this case supports their position that the status of
the named insured as an individual entitles him to coverage.  <u>San
Juan</u> does not stand for such a proposition.  As an initial
matter, the <u>San Juan</u> court did not analyze an insurance policy
that had a declarations page that limited coverage based upon the

---

[10]    Moreover, to the extent that the Declarations page and
the Endorsement page created ambiguity, as set forth above, the
extrinsic evidence demonstrates that Dobbas did not reasonably
expect the Steadfast policy to cover his ranching activities
because he purchased a separate $1 million policy for such
liability.   <u>See Bohman v. Berg</u>, 54 Cal. 2d 787, 795 (1960)
("[T]he practical construction placed upon [a contract] by the
parties before any controversy arises as to its meaning affords
one of the most reliable meaning of determining the intent of the
parties.").

description of the business.  Further, the <u>San Juan</u> court noted

that "a reference to 'any named insured' . . . fairly means any

company or individual named in the named insured endorsement but

*subject to* any other language that directly restricts the extent

to which that company or individual is classified as a named

insured."  <u>Id.</u> at 573 (emphasis in original).  Under the facts of

<u>San Juan</u>, the court found that liability was limited by a clause

requiring that the individual be the sole proprietor of a

business.  <u>Id.</u>  Applied to the facts of this case, coverage of

the named insured, Dobbas, is *subject to* the business description

limitation set forth on the Declarations page.

Therefore, because the scope of coverage of the Steadfast

policy was clearly limited by the business description of

"Railroad Contractor" set forth on the Declarations page and

because such an interpretation of the policy is supported by

extrinsic evidence, plaintiff Steadfast's motion for summary

judgment regarding its First claim for relief is GRANTED, and

defendants' motion for summary judgment on this claim is DENIED.

Dobbas' ranching activities are not covered by Steadfast's

general commercial liability policy.

**2.    The American Policy**

The American policy provides for commercial umbrella

liability for JDI.  The Steadfast policy is the policy of

insurance listed in the schedule of underlying insurance attached

to and forming a part of the American policy.  Implicitly,

American argues that the Declarations page of the Steadfast

policy should be read into the American policy, and as such, the

scope of coverage of the American policy is similarly limited by the business description of "Railroad Contractor."[11]

Dobbas' ranching activities at the time of the collision are covered by the plain language of the policy. Dobbas is listed as an individual named insured under the American policy. (American Policy, Ex. B to FAC, filed Apr. 15, 2005). The policy provides that an insured individual is defined as the named insured and his spouse "with respect to the conduct of a business of which [the insured is] the sole owner." (Id.) There is no dispute that Dobbas was engaged in the cattle ranching business at the time of the collision. (PUF ¶ 24).

The court finds no provision in the American policy that limits the umbrella policy's scope to activities related to the business of "Railroad Contractor." Whereas the Steadfast policy limits coverage through the business description on the declarations page, there are no comparable provisions in the American policy. See Travelers, 2007 WL 4170421, at *10 (denying insurer's motion for summary judgment and holding that, in contrast to the primary policy that had limiting language with respect to a business description, the umbrella policy at issue was not reasonably susceptible to a construction that would limit coverage). Moreover, plaintiffs fail to point to any ambiguities in the language of the American policy that justifies the court's consideration of extrinsic evidence. See Travelers, 2007 WL 4170421, at *9.

---

[11]   Plaintiffs only discuss the policies collectively in their opposition.

18

1   While plaintiffs ask the court to import the limits of
2   coverage of the underlying Steadfast policy into the American
3   umbrella policy, such incorporation is not supported by the terms
4   of the contract.  Coverage A, which provides excess follow form
5   liability insurance explicitly states that "the terms and
6   conditions" of the listed underlying insurance, which includes
7   the Steadfast policy, are part of the American policy.  (American
8   Policy, Ex. B to FAC, filed Apr. 15, 2005).  However, this
9   ignores the terms of Coverage B, which provides for umbrella
10  liability insurance.  (Id.)  Notably absent from the terms
11  relating to Coverage B is any language that incorporates the
12  terms of underlying insurance.  Rather, Coverage B expressly
13  states that it does not apply to any loss for which insurance is
14  afforded under underlying insurance; it provides "umbrella"
15  liability insurance.  (Id.)  As such, American's umbrella
16  liability policy does not incorporate the limitations of coverage
17  contained in the terms and conditions of the Steadfast policy.

18  Therefore, because Dobbas was covered as an individual and
19  there was no express limitation as to that coverage and because
20  there is no ambiguity in the language of the American policy that
21  justifies consideration of extrinsic evidence, plaintiff
22  American's motion for summary judgment regarding its First claim
23  for relief is DENIED, and defendants' motion for summary judgment
24  on this claim is GRANTED.  Dobbas' ranching activities are
25  covered by American's commercial umbrella liability policy.

26  **B.   Expected or Intended Damage**

27  Plaintiffs' Second claim for relief seeks declaratory relief
28  that the policies do not provide coverage because Dobbas expected

19

the injuries that occurred as a result of the escaped bull. Defendants move for summary judgment on the grounds that plaintiffs cannot demonstrate that Dobbas expected or intended bodily injury.  Plaintiffs contend that they have produced sufficient evidence to raise a triable issue of fact.

The American policy provides, in relevant part, that coverage is excluded for "[b]odily injury or property damage expected or intended from the standpoint of the insured." (American Policy).  The California Supreme Court has stated that the "test for 'expected' damage is whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage."[12] Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 304-05 (1993) (citing Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal App. 4th 715, 748 (1993).  "The phrase 'expected or intended' precludes coverage for damage that the insured subjectively intended to be a result of its conduct, as well as damage that it in fact subjectively foresaw as practically certain to be a result of its conduct." Waller, 11 Cal. 4th at 17 (citing Shell Oil, 12 Cal. App. 4th at 747).  However, "a specific intent on the part of the insured to cause *all* the resultant damage is not required." Reagen's Vacuum Truck Serv., Inc. v. Beaver Ins., 31 Cal. App. 4th 375, 388 (1994) (emphasis added).

Defendants present evidence that Dobbas, the insured, did not put the bulls in the pasture with the purpose of permitting them to escape and cause injury.  (PUF ¶ 30).  Dobbas also

---

[12]    Plaintiffs do not contend that Dobbas intended to cause bodily injury through his action or inaction.

20

testified that it was not highly likely in his mind that the bulls would escape and get on the highway where they could cause serious injury. (PUF ¶ 31). In an effort to create a triable issue of fact, plaintiffs present evidence that the fact that livestock will escape is inherent and understood in the ranching business and that Dobbas sought insurance for such a risk.[13] (RUF ¶ 29). Plaintiffs also present evidence that Dobbas knew a bull would be able to break through good and well-maintained fencing if it was sufficiently agitated. (RUF ¶ 32). However, there is no evidence that Dobbas acted in any way to sufficiently agitate his bulls so that they would break through his fence or to otherwise facilitate the escape of the bulls. While, the escape of bulls may be a risk inherent in the cattle ranching business generally, plaintiffs have failed to present evidence that Dobbas subjectively foresaw the escape of the Angus bull and subsequent injury to the Turners and the Mancinis as practically certain.

Therefore, because plaintiffs have failed to present sufficient evidence to create a triable issue of fact, defendants' motion for summary judgment regarding plaintiffs' Second claim for relief is GRANTED.

## C.   Intentional Failure to Disclose Known Hazards

Plaintiffs' Third claim for relief seeks declaratory relief that the policies do not provide coverage because Dobbas

---

[13]   Plaintiffs' contention that Dobbas' purchase of farm liability coverage evidences an expectation of harm such that coverage is excluded is not only circular, but troubling. Individuals may seek insurance for a potential or probable risk without being practically certain that such harm will occur. In fact, this is likely why most consumers purchase insurance.

intentionally failed to disclose the ultrahazardous activity of husbanding bulls.  Defendants move for summary judgment on the grounds that plaintiffs have failed to proffer sufficient evidence that Dobbas intentionally failed to disclose his ranching activities.[14]

Plaintiffs contend that there is sufficient evidence to demonstrate a triable issue of fact as to whether Dobbas intentionally failed to disclose his ranching activities based solely on the fact that such hazards were not explicitly disclosed.[15]  Plaintiffs argue that an inference of intentional conduct can be drawn from this failure coupled with Dobbas' awareness of the potential danger of escaped bulls.  (Pls.' Opp'n at 12).

The court finds that there is insufficient evidence to demonstrate that there is a triable issue of fact that Dobbas intentionally failed to disclose known hazards to plaintiffs.

_____

[14]  Defendants also contend that plaintiffs' Third claim for relief is based solely on the lack of coverage due to the alleged failure to disclose ultra-hazardous activities, for which there is no explicit exclusion in the policy.  However, a fair reading of the FAC demonstrates that plaintiffs sufficiently alleged that there was no coverage because Dobbas intentionally failed to disclose an ultra-hazardous risk.  (FAC ¶ 99).

The court notes that plaintiffs only refer to language in the Steadfast policy that limits coverage based upon intentional failure to disclose.  As set forth above, the Steadfast policy does not provide coverage for Dobbas' ranching activities. Plaintiffs point to no such language in the American policy. However, in an abundance of caution, the court reviews the evidence relating to plaintiffs' evidence of intent.

[15]  The parties dispute whether plaintiffs were aware of Dobbas ranching activities.  Plaintiffs present evidence that O'Dell, JDI's insurance broker and an agent of Ward Agency, a direct agent of Zurich (the parent company of both Steadfast and American) was aware of Dobbas' ranching activities.  (RUF ¶ 14; RSDF ¶¶ 14-17).

Plaintiffs themselves present evidence that Dobbas did not understand the policies at issue to provide coverage for his ranching activities and that this understanding is why he didn't initially tender the underlying claim to plaintiffs. (RUF ¶ 9). It is also undisputed that Dobbas purchased separate primary and umbrella liability insurance for his ranching activities. (DUF ¶¶ 9-10).[16]   In light of the undisputed evidence that Dobbas did not seek coverage under the American policy for his ranching activities at the time it was purchased,[17] a reasonable trier of fact could not infer that the failure to disclose the hazards associated with ranching activities was intentional based solely on the failure to disclose, itself.   Therefore, defendants' motion for summary judgment regarding plaintiffs' Third claim for relief is GRANTED.

**D.   Notice**

Plaintiffs' Fourth claim for relief seeks declaratory relief that the policies do not provide coverage because Dobbas did not comply with the notice requirements of the policy.   Plaintiffs and defendants both move for summary judgment on this claim. Plaintiffs contend that they owe defendants no obligations under the insurance policies at issue because James Dobbas failed to

---

[16]   Essentially, in one breath, plaintiffs argue that the parties did not intend to provide coverage for ranching activities under plaintiffs' policies as evidenced by Dobbas' understanding that no coverage was provided; in the next breath, they argue that Dobbas did seek coverage for his ranching activities and intentionally failed to disclose hazardous activities.   These arguments are contradictory.

[17]   "Sometimes valid general provisions in contracts do produce recoveries that no one quite envisioned." San Juan, 45 F.3d at 576 (1st Cir. 1995).

23

give plaintiffs timely notice as required under the policy.  The
American policies require that the insured must promptly notify
the insurer of an occurrence or offense which may result in
damages covered by the policy, and that there will be no right of
action against the insurer if the insured does not comply with
all conditions of the policy.  (DUF ¶¶ 64, 66).  Defendants
contend that they are entitled to summary judgment because
plaintiff cannot establish substantial prejudice from the lack of
notice by Dobbas.

The law is well settled in California that "breach by an
insured of a . . .  notice clause may not be asserted by an
insurer unless the insurer was substantially prejudiced thereby."
Northwestern Title Sec. Co. v. Flack, 6 Cal. App. 3d 134, 141
(1970); see Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal.
App. 4th 715, 760-61 (1993).  Prejudice is ordinarily a question
of fact.  Northwestern Title Sec. Co., 6 Cal. App. 3d at 141.
Prejudice does not exist as a matter of law merely from the fact
of delay alone nor can any presumption or inference of prejudice
be drawn from the mere fact of delay.  Id.  The burden of proving
prejudicial breach is on the insurer, and the insurer must show
actual prejudice, not the mere possibility of prejudice, in order
to meet its burden.  Id.  The insurer "must establish at the very
least that if the [] clause had not been breached there was a
substantial likelihood the trier of fact would have found in the
insured's favor."  Billington v. Interinsurance Exch. Of S. Cal.,
71 Cal. 2d 728, 737 (1969).  The California Supreme Court has
explained that under the notice-prejudice rule, "prejudice is not
shown by displaying end results; the probability that such

24

results could or would have been avoided absent the claimed default or error must also be explored." Clemmer v. Hartford Ins. Co., 22 Cal 3d. 865, 883 n.12 (1978).  Plaintiffs bear the burden of presenting evidence of actual prejudice due to the lack of notice.  Northwestern Title Sec. Co., 6 Cal. App. 3d at 141.

Plaintiffs previously moved for summary judgment in this litigation based upon Dobbas' failure to give them timely notice of the claims.  The court found that while plaintiffs has presented evidence of what they would have done if they had notice of the claim, plaintiffs did *not* present evidence that, if these steps had been taken, it was substantially likely that the arbitrator would have found for the insured or that the matter would have settled for considerably less than $5 million if they had been informed earlier.  (Mem. & Order ("Order") [Docket # 63], filed Jan. 12, 2006, at 7-8).  Rather, plaintiffs sought the court to infer actual prejudice from the circumstances of the case.  (Id. at 9).  The court noted that the circumstances of the case demonstrated a possibility of prejudice to the plaintiffs, but ultimately held that it could not infer prejudice from a negative end result or from the speculation of plaintiffs that the results of the arbitration or a potential settlement would have been different.  (Id.) (citing Clemmer, 22 Cal 3d. at 883 n.12).

In support of their present motion, plaintiffs present evidence that they suffered actual prejudice as a result of the lack of notice.  Plaintiffs present the testimony of Professor Michael H. Hall ("Hall"), an expert on cattle behavior, livestock management, and standards of care.  Plaintiffs contend that they

25

would have offered Hall's opinions at the arbitration, which would have rebutted or contradicted of Dr. Michael J. Pontrelli ("Pontrelli"), the expert who testified in support of the Turners and Mancinis at the arbitration.  (See DUF ¶¶ 72-77).  Plaintiffs also present the expert testimony of Donald S. Walter, Esq. ("Walter"), a member of the American Board of Trial advocates who has tried over 200 cases to a verdict.  (See DSDF ¶ 123-22).  Walter testified that the underlying case was a defensible case, neither a slam dunk from plaintiffs' or defendants' perspective.  (Dep. of Donald S. Walter, Esq. ("Walter Dep."), Ex. 23 to Decl. of Paul S. Donsbach, filed Nov. 15, 2007, at 17:6-23).  Walter also opined that it could have been settled in the $2 million to $3 million range if it had been mediated.  (Id. at 18:8-9).

However, defendants present evidence that Dobbas and CalFarm/Allied contested the issues of liability and general damages at the arbitration.  (DSDF ¶ 39).  Defendants contend that Dobbas testified as an expert regarding the standard of care for pasturing bulls.  (DSDF ¶ 53).  Defendants also present evidence that prior to the arbitration, the parties to the underlying arbitration participated in mediation and lengthy negotiations.  (DSDF ¶¶ 7, 15-16).  Further, in his Decision and Award, the arbitrator rejected two of the four grounds for liability proposed by the Turners and the Mancinis.  (DSDF ¶¶ 71-76).  Defendants also point out that plaintiffs' expert, Walter, did not testify that there was a substantial likelihood that a defense verdict would have resulted if American had been notified and defended Dobbas; rather, Walter testified that the case was

*defensible*, but that ultimately, jury trials are an "unpredictable business." (DSDF ¶ 85).

The evidence presented by plaintiffs and defendants demonstrate that there is a triable issue of fact regarding whether American was actually prejudiced by the lack of notice. Plaintiffs present sufficient evidence, if believed and credited by a trier of fact, that American was prejudiced by the lack of notice because it could have provided contradictory expert evidence that the arbitrator or jury might have credited and because it could have settled for substantially less than the $5 million awarded by the arbitrator.  However, defendants present evidence that the underlying action was mediated, negotiated, and hotly contested during arbitration such that the end result would not have been substantially different had American been given notice.  Based upon this evidence, the court cannot find as a matter of law that American was or was not prejudiced by the lack of notice.  Therefore, plaintiffs' and defendants' motions for summary judgment regarding plaintiffs' Fourth claim for relief are DENIED.[18]

/////

---

[18]   As in their prior motion for summary judgment, plaintiffs cite to <u>Select Insurance Co. v. Superior Court of San Diego County</u> to support the proposition that an insurer may meet its burden of establishing prejudice as a matter of law by showing that the untimely delay deprived the insurer of the opportunity to settle.  226 Cal. App. 3d 631, 638 (1990). However, <u>Select Ins. Co.</u> does not stand for such a proposition. The court in <u>Select Ins. Co.</u> held that a trial court's grant of summary judgment *against* the insurer was improper under such circumstances because the missed opportunity created an issue for adjudication regarding the insurer's notice defense.   <u>Id.</u> at 639. The circumstances analyzed by the court showed the possibility of prejudice, but did not demonstrate actual prejudice.

**E.    Failure to Comply with the Terms and Conditions**

Plaintiffs' Fifth claim for relief seeks declaratory relief
that the terms and conditions of the policy were not complied
with by Dobbas because the judgment was obtained without an
actual trial.  Plaintiffs and defendants both move for summary
judgment on this claim.  Plaintiffs assert that the arbitration
proceeding did not constitute an actual trial because the
Mancinis' and Turners' claims went almost completely unchallenged
and because the process created the potential for collusion.
Defendants assert that the undisputed facts demonstrate that the
underlying arbitration constituted an actual trial.

The American policy provides, in relevant part, that
"[t]here will be no right of action against [American] . . .
unless . . . the amount you owe has been determined by settlement
with our consent or by actual trial and final judgment."  (DUF ¶
66).  "[T]he term 'actual trial' in [a] standard 'no action'
clause has two components: (1) an independent adjudication of
facts based on an evidentiary showing; and (2) a process that
does not create the potential for abuse, fraud, or collusion."
Nat'l Union Fire Ins. Co. v. Lynette C., 27 Cal. App. 4th 1434,
1449 (1994).  In Lynette C., the insurer argued that it was not
bound by the judgment Lynette had obtained against its insured
because it was the result of an hour and a half proceeding during
which the insured did not present any evidence.  Id. at 1440-41,
1449-50.  However, the court held that the proceeding satisfied
the first component because Lynette presented evidence to
substantiate her claims and it was clear from the record that the
judge made his decision based upon an independent review of the

28

facts.  _Id._  The court also held that the second component was
satisfied in part because "the uncontested proceeding involved a
court independently adjudicating the facts based on an array of
evidence;" thus, the procedure was more than just a stipulated
judgment between Lynette and the insured.  _Id._ at 1451.

The undisputed facts of this case demonstrate that the
arbitration proceeding satisfies the "actual trial" requirement
of American's "no action" clause.  First, the arbitration was an
independent adjudication of facts based on an evidentiary
showing.  _Id._ at 1449.  The arbitration lasted less than one day,
during which the Mancinis and the Turners presented six live
witnesses, one witness by deposition testimony, 27 exhibits and
expert testimony.  (DUF ¶¶ 23, 25).  Dobbas presented two live
witnesses and testified for approximately a half hour.  (DUF ¶¶
27-28).  The arbitrator was not aware of the CalFarm/Allied's
agreement to make an irrevocable offer of its policy limits.
(DSDF ¶ 38).  On March 26, 2004, the arbitrator issued a thirty-
eight (38) page "Decision and Award," which contained detailed
findings with respect to liability and damages.  (Decision and
Award, Ex. Q to Decl. of James E. Simon, filed Nov. 27, 2007).

Second, the arbitration was not a process that created the
potential for abuse, fraud, or collusion.  _Lynette C._, 27 Cal.
App. 4th at 1451.  The arbitrator was not aware of the agreements
between the parties.  The undisputed evidence regarding the
supervision of the arbitration and the evidence presented by both
the plaintiffs and the defendants demonstrates that the
arbitration was more than simply a substitute for a stipulated
judgment.  _See_ _id._

1    Plaintiffs' argue that the facts analyzed by the court in

2  Fuller-Austin Insulation Co. v. Highlands Ins. Co., 135 Cal. App.

3  4th 958 (2006), are more akin to the facts of this case, and

4  thus, the court should similarly hold that there was not an

5  actual trial.  However, the facts of Fuller-Austin are

6  distinguishable from the facts of this case.   In Fuller-Austin,

7  the underlying procedure was a bankruptcy confirmation

8  proceeding.  Id. at 979-80.  The bankruptcy court expressly

9  limited the scope of the hearing to a one-hour presentation by

10  the insured without any cross-examination.   Id.  The evidence did

11  not address liability, but only the fairness of the bankruptcy

12  plan, which was the result of negotiation between the insured and

13  claimants, not fact-finding.  Id. at 980.  Further, the key

14  purpose of the bankruptcy court's findings were to ascertain the

15  plan's good faith and reasonableness.  Id. at 980-81 (noting that

16  the facts were unlike those in Lynette C., where the court was

17  asked to and did make independent findings on liability and

18  damages).  In this case, there is no evidence that the scope of

19  the arbitration was limited in any way.  Evidence was presented

20  by both parties on the issue of liability.  (DUF ¶¶ 27-29).

21  Further, Dobbas never conceded liability prior to the

22  arbitration, and the result of the arbitrator's decision was an

23  independent finding with respect to both liability and damages.

24  (DUF ¶ 48).  As such, the court's holding in Fuller-Austin is

25  inapplicable to the facts of this case.

26    Plaintiffs also argue that the court should apply the

27  rationale of the court in Lipson v. Jordache Enterprises, Inc., 9

28  Cal. App. 4th 151, 158-61 (1992), and hold that the arbitration

was a substitute for a stipulated judgment.  However, the facts

of Lipson are also distinguishable from the facts of this case.

In Lipson, two days before the trial, the insured entered into a

last minute stipulation with the plaintiff to amend the complaint

to add two causes of action arguably covered by the policy.  Id.

at 158.  The court held that the last minute stipulation to amend

the complaint in conjunction with the perfunctory trial with

little opposition appeared to be a stipulated judgment entered

into with the aim of creating policy coverage.  Id.  In this

case, there is no similar evidence that the parties came to an

agreement or acted in any way to further the purpose of ensuring

coverage under the American policy.  In Lipson, the insured had

informed the insurer of his claims two years prior to the trial,

and the insurer denied coverage and refused to defend because it

did not provide coverage for the causes of action alleged.  Id.

at 154.  The amendment to the claim two days prior to trial

appeared to be an attempt to secure coverage without

participation of the insured.  Id. at 158.  In this case, the

undisputed evidence demonstrates that neither Dobbs nor American

were aware of the possible coverage under the umbrella policy

prior to the arbitration.  As such, unlike in Lipson, there was

no apparent purpose to secure coverage through a sham arbitration

without the participation of American.

Finally, plaintiffs argue that the court should not focus on

what happened at the arbitration, but what *should* have happened.

(Pls.' Reply, filed Dec. 7, 2007, at 2).  However, plaintiffs

cite no authority for this unique approach.  Rather, it is

contrary to the approaches of the very cases cited by plaintiffs.

While plaintiffs' contention and evidence that its insured's position could have been better represented at the arbitration is relevant to the inquiry into whether it was actually prejudiced by the lack of notice, plaintiffs' proffered evidence of allegedly lackluster representation is not sufficient to demonstrate that there was not an actual trial.  See Lynette C., 27 Cal. App. 4th at 1449-50 (holding that an "actual trial" was held where the insured failed to present *any* evidence in its favor).

Therefore, because the undisputed evidence demonstrates that there was an "actual trial" for purposes of a standard "no action" clause, defendants' motion for summary judgment is GRANTED, and plaintiffs' motion for summary judgment is DENIED.

**F.   Collusion**

Plaintiffs' Sixth claim for relief seeks equitable relief from judgment based upon collusion among one or more of the insureds, the Mancini defendants, and the Turner defendants. Plaintiffs and defendants both move for summary judgment on this claim.  Plaintiffs assert that the arbitration proceeding was the product of a collusive scheme to set up the predicate judgment for a subsequent claim against Vitas and VIA.[19]  Defendants assert that plaintiffs have failed to proffer sufficient evidence to support this claim.

---

[19]   The court notes that plaintiffs do not discuss this claim separately from their claim that there was not an "actual trial."  Moreover, plaintiffs fail to cite any case law or set forth an applicable rules relating to equitable relief from judgment based upon collusion.

Where a judgment is brought about by fraud or collusion, an insurer is not bound. <u>Zander v. Texaco, Inc.</u>, 259 Cal. App. 2d 793, 804 (1968). Under California law,

> Collusion has been variously defined as (1) a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right; (2) a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceeding of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers; and (3) a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes.

<u>Span, Inc. v. Associated Int'l Ins. Co.</u>, 227 Cal. App. 3d 463, 484 (1991) (internal quotations omitted). However, "[w]hat constitutes collusion will differ with each fact situation." <u>Id.</u> "[I]n an action by the injured party against the insurer, before fraud or collusion can exist to negate the insurer's liability, two matters must coincide: (a) the fraud must not be intrinsic, and (b) it must be pleaded and shown with specificity." <u>Zander</u>, 259 Cal. App. 2d at 804. The fact that an insured permitted an injured party to take an uncontested judgment and that the injured party unopposed proved a case under which a monetary judgment was pronounced by a trial court does not establish fraud. <u>Id.</u> at 806. Rather, a cognizable claim of collusion requires evidence that the injured party had no substantial claim or chance of recovery and that the parties had permitted a judgment in the injured party's favor that was disproportionate to the injuries. <u>Id.</u>

Plaintiffs' evidence in support of their assertion that there was collusion in obtaining the underlying judgment is

insufficient.  Plaintiffs merely assert that the representation of the insured at the arbitration was deficient and allege that there was collusion to set up a predicate judgment against Vitas and VIA.  However, plaintiffs fail to present any specific evidence of a deceitful agreement or compact, deception of the court or its officers, or a fraudulent purpose.  As set forth above, the undisputed evidence demonstrates that neither liability nor damages were conceded at the arbitration.  <u>Cf.</u> <u>Span</u>, 227 Cal. App. 3d at 485 (finding a triable issue of fact regarding collusion where the policyholder not only agreed not to contest to the trial, but also stipulated to liability and to the reasonableness and necessity of the plaintiff's medical bills).  While plaintiffs have presented evidence that they may have been able to garner a more favorable outcome if they had been given notice, there is no evidence that the Turners and Mancinis had no chance of recovery or that the judgment was disproportionate to the injuries.  <u>See</u> <u>Zander</u>, 259 Cal. App. 2d at 806-07 (upholding the trial court's judgment on the claim of collusion where there was no evidence that the injured party didn't have a substantial chance of recovery or that the judgment was disproportional).  As such, plaintiffs have failed to present sufficiently specific evidence of collusion.

Therefore, plaintiffs' motion for summary judgment regarding their Sixth claim for relief is DENIED, and defendants' motion for summary judgment is GRANTED.

/////

/////

/////

**G.    California Insurance Code § 11580**

Defendants counterclaim for enforcement of the judgment against plaintiff pursuant to California Insurance Code § 11580. Defendants move for summary judgment on this claim.

"A direct action under section 11580 is a contractual action on the policy to satisfy a judgment up to policy limits." <u>Wright v. Fireman's Fund Ins. Co.</u>, 11 Cal. App. 4th 998, 1015 (1992). In order to maintain such an action and to recover upon their judgment, defendants must demonstrate

> 1) it obtained a judgment for bodily injury, death, or property damage, 2) the judgment was against a person insured under a policy that insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal, 3) the liability insurance policy was issued by the defendant insurer, 4) the policy covers the relief awarded in the judgment, 5) the policy either contains a clause that authorizes the claimant to bring an action directly against the insurer or the policy was issued or delivered in California and insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal.

<u>Id.</u>

As set forth above, there are triable issues of fact regarding whether plaintiff American was actually prejudiced by the lack of notice.  As such, there are triable issues regarding whether American is bound by the judgment that resulted from the underlying arbitration.  Therefore, defendants' motion for summary judgment is DENIED.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part, and defendants'

motion for summary judgment is GRANTED in part and DENIED in part:

    1.   Plaintiff Steadfast's motion for summary judgment is GRANTED because there is no coverage under its policy for Dobbas' ranching activities.

    2.   Regarding plaintiffs' First claim for relief, plaintiff American's motion for summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED.

    3.   Regarding plaintiffs' Second claim for relief, defendants' motion for summary judgment is GRANTED.

    4.   Regarding plaintiffs' Third claim for relief, defendants' motion for summary judgment is GRANTED.

    5.   Regarding plaintiffs' Fourth claim for relief, plaintiff American's motion for summary judgment is DENIED, and defendants' motion for summary judgment is DENIED.

    6.   Regarding plaintiffs' Fifth claim for relief, plaintiff American's motion for summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED.

    7.   Regarding plaintiffs' Sixth claim for relief, plaintiff American's motion for summary judgment is DENIED, and defendants' motion for summary judgment is GRANTED.

    8.   Regarding defendants' counterclaim for relief, defendant's motion for summary judgment is DENIED.

    IT IS SO ORDERED.

DATED: February 5, 2008.

_____
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE